**William K. Hanagami**
**HANAGAMI LAW**
**A PROFESSIONAL CORPORATION**
**913 TAHOE BOULEVARD, SUITE 5**
**INCLINE VILLAGE, NV 89451-7414**
**(833) 716-8570 / (833) 716-8569** *FAX*
**Bill@Hanagami.com**

**Abram J. Zinberg**
**THE ZINBERG LAW FIRM**
**A PROFESSIONAL CORPORATION**
**412 OLIVE AVENUE, SUITE 528**
**HUNTINGTON BEACH, CA 92648-5142**
**(714) 374-9802 / (714) 969-0910** *FAX*
**AbramJ@ZinbergLaw.com**

Attorneys for Plaintiff and *Qui Tam* Relator,
Charles M. Holzner, M.D.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* CHARLES M. HOLZNER, M.D., <br><br> Plaintiffs, <br><br> vs. <br><br> DAVITA INC., a Delaware Corporation; DAVITA KIDNEY CARE, a business entity, form unknown;  DAVITA RX, LLC, a Delaware Limited Liability Company, <br><br> Defendants. | Case No. SACV18-1250-JLS(DFMx) <br> [The Hon. Josephine L. Staton] <br><br> [PROPOSED] SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT; REQUEST FOR JURY TRIAL |

COMES NOW, Plaintiff and *Qui Tam* Relator Charles M. Holzner, M.D., individually and on behalf of the United States of America, alleges as follows:

## INTRODUCTION

Defendants violated the False Claims Act by perpetrating the following  nationwide fraudulent schemes involving the treatment of End Stage Renal Disease (ESRD) Medicare patients:

a.    The medically unnecessary early initiation of dialysis treatment to approximately 30% of defendants' ESRD patients;

b.    Using and providing Sensipar, a parathyroid medication given to ESRD patients, which is ineffective and therefore medically unnecessary; and

c.    Using and providing Renagel, a very expensive phosphate binder, instead of equally effective, safer and much less expensive non-prescription phosphate binders, such as Tums.

These nationwide frauds caused the United States Government and numerous Medicare Advantage health plans to pay several billion dollars of false and fraudulent claims in violation of the False Claims Act, 31 U.S.C. § 3729(a).

## JURISDICTION AND VENUE

1.    Plaintiff and *Qui Tam* Relator Charles M. Holzner, M.D. (Relator) files this action on behalf and in the name of the United States of America (Government) seeking damages and civil penalties against the defendants for violations of 31 U.S.C. § 3729(a).

2.    This Court's jurisdiction over the claims for violations of 31 U.S.C. § 3729(a) is based upon 31 U.S.C. § 3732(a).  Venue is vested in this Court under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because at least one of the defendants can be found in, resides in and/or transacts business in the Central District of California and many acts constituting violations of 31 U.S.C. § 3729(a) occurred in the Central District of California.

## THE PARTIES

3.    Relator is a citizen of the United States and resident of the State of California. Relator brings this action on behalf of the Government under 31 U.S.C. § 3730(b).

4.    At all times relevant, the Government funded the Medicare Program (Medicare) which provides payment of healthcare services for, among others, those 65 years of age and older.  Medicare is a health insurance program administered by the Government that is funded by federal taxpayer revenue.  Medicare is overseen by the Government's Health and Human Services Department (HHS) and administered by the HHS's Centers for Medicare and Medicaid Services (CMS).  Additionally, at all times relevant the Government funds, pays for,

-2-

partially funds or partially pays for the Medicaid program administered in each of States in the United States. The Medicaid program provides healthcare benefits to individuals and families having low income and resources.

5.    At all times relevant, CMS provided a Medicare option known as Medicare Advantage (MA), previously known as Medicare+Choice, in which eligible Medicare beneficiaries can enroll with a Medicare Advantage organization (MAO) contracted with the Government (for a capitated rate paid by the Government to the MAO) that would provide at least those services provided to standard (i.e., fee-for-service) Medicare beneficiaries.

6.    The Civilian Health and Medical Program of the Uniformed Services (CHAMPUS) is a Government-funded program administered by the Government's Department of Defense that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired and deceased members of the Uniformed Services, as well as of reservists who were ordered to active duty for 30 days or longer.

7.    The Civilian Health and Medical Program of the Veterans Administration (CHAMPVA) provides similar benefits for spouses and children of veterans who are entitled to Veteran's Administration (VA) permanent and total disability benefits and to widows and children of veterans who died of service-related disabilities. The program is administered by the Government's Department of Defense and funded by the Government.

8.    Medicare, Medicaid, MAOs, CHAMPUS and CHAMPVA are collectively referred as the "Government Funded Payors," and meet the definition of a federally funded healthcare program or service under 42 U.S.C. § 1320a-7b(f).

9.    At all times relevant, defendant DaVita Inc. (DaVita) is and was a corporation formed under the laws of the State of Delaware, and maintained offices and transacted business in, among other places, the Central District of California. DaVita is a Fortune 500 company with over $10 billion in annual revenues.

10.    At all times relevant, defendant DaVita Kidney Care (DKC) is and was a wholly owned subsidiary of DaVita whose business form is currently unknown. DKC has locations

-3-

in and conducts business in, among other places, the Central District of California.  DKC operates and provides administrative services for DaVita's 2,500 dialysis clinics nationwide, serving approximately 195,000 end stage renal disease (ESRD) patients.  Federal law requires that all ESRD facilities, such as DKC, are under the control of an identifiable governing body.  Relator is informed and believes, and upon such information and belief alleges, that DaVita is the single identifiable governing body of all DKC dialysis facilities.[1]

11.    At all times relevant, defendant Davita Rx, LLC (DRX) is and was a limited liability company with its headquarters in Copple, Texas.  DRX is a full service pharmacy that specializes in providing medications to DaVita's and DKC's ESRD patients, and transacted business in, among other places, the Central District of California.

12.    At all times relevant, defendants contracted with Government Funded Payors to provide dialysis services, supplies, medications and in-home training to patients suffering from ESRD.[2]

13.    Relator Charles M. Holzner, M.D. (Relator) has been licensed to practice medicine in California since 1980 and Board Certified in Internal Medicine since 1983.  During 1992, Relator was one of the original co-founders of CareMore Health Plan (CareMore) which grew from 6,000 MA enrollees to currently having more than 100,000 MA enrollees in six states.  Relator served as CareMore's Chief Hospitalist from 1992 until 2006 where he led a team of hospitalists responsible for overseeing all of CareMore's inpatient care.  Relator then was promoted to CareMore's Senior Medical Officer, a position he held until 2016.  CareMore's hospitalist program was well recognized in trade journals, the Wall Street Journal, and the Atlantic Monthly for achieving significant reductions in the length of in-

---

[1] 42 C.F.R. § 494.180 states in part that each ESRD facility "[i]s under the control of an identifiable governing body, or designated person(s) with full legal authority and responsibility for the governance and operation of the facility. The governing body adopts and enforces rules and regulations relative to its own governance and to the health care and safety of patients, to the protection of the patients' personal and property rights, and to the general operation of the facility."

[2] While most ESRD services are provided through Medicare and MAOs, the other Government Funded Payors were responsible as a secondary insurer for some of the subject ESRD treatment costs and in situations where the beneficiary's coverage under Medicare was delayed due to waiting periods to become active or was otherwise denied.

patient stays while simultaneously decreasing the patients' hospital recidivism, an indicator of high quality care. While serving as CareMore's Senior Medical Officer, Relator founded and led CareMore's MA Special Needs Plan (SNP) which had more than 1,500 ESRD enrollees. Beginning in 2007 and continuing to the present, CareMore's SNP contracted with DaVita to provide dialysis and related services to CareMore's ESRD enrollees. Relator learned of the frauds alleged in this complaint through the course and scope of his employment as CareMore's Senior Medical Officer and his responsibilities overseeing CareMore's SNP. During the course and scope of his employment as CareMore's Senior Medical Officer, Relator interacted with defendants on a regular basis and through those interactions learned of defendants' frauds alleged herein.

## FACTUAL ALLEGATIONS

Medicare Overview

14.    Medicare is a federally-operated health insurance program administered by CMS. Parts A and B of the Medicare Program are known as "original" or "fee-for-service" Medicare. Medicare Part A generally covers inpatient and institutional care. Medicare Part B generally covers physician, hospital outpatient, and ancillary services and durable medical equipment.

15.    Under Medicare Parts A and B, CMS reimburses healthcare providers (e.g., hospitals, physicians, etc.) using what is known as a "fee-for-service" (FFS) payment system. Under a FFS payment system, healthcare providers submit claims to CMS for reimbursement for each service, such as a physician office visit or a hospital stay. CMS then pays the providers directly for each service. As a condition of payment the CMS claim form requires all providers to certify the services they are attempting to be paid for are medically necessary.

16.    The Medicare Advantage (MA) program is Medicare's managed care program which is administered by CMS. The MA program, also known as Medicare Part C, requires the MAO to provide all of the benefits provided under original Medicare and all additional supplemental benefits, if any, that have been approved by CMS and made part of that MAO's MA plan. 42 C.F.R. § 422.102(a). Through the MA program, Medicare allows private HMO

and health insurer MAOs to utilize managed healthcare plans to cover their MA beneficiaries.

17.    Under the MA program, the Government, through CMS, pays an MAO a per-member-per-month (pmpm) capitation payment in exchange for the MAO providing or arranging for the provision of all covered health care services required by the MA beneficiaries that select such MAO as their MA plan.

18.    As an express condition of payment all MAOs must certify that any data submitted which its used in the calculating the MAO's capitation payments is certified as being accurate, truthful and complete and in compliance with all Medicare's rules and regulations such as the basic requirement that all such services were medically necessary and reasonable.

19.    MAO's subcontractors, such as defendants, are required to certify that all claims submitted to MAOs for payment are medically necessary and reasonable. Likewise, all data submitted by a MAO's subcontractor that may be utilized in calculating such MAO's capitation payments must be certified as being accurate complete and truthful.

20.    One of the fundamental maxims of Medicare, including the MA program, is that only services that are medically reasonable and necessary are covered. Under the Social Security Act, Medicare is only authorized to pay for items and services that are "reasonable and necessary" and makes satisfying this condition an express condition of Medicare payment.[3]  42 U.S.C. § 1395y(a)(1) ["(a) Items and services specifically excluded. **Notwithstanding any other provision of this subchapter, no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services**–(1)(A) which, except for items and services described in a succeeding subparagraph or additional preventive services (as described in section 1395x(ddd)(1) of this title), **are not reasonable and necessary** for the diagnosis or treatment of illness or injury or to improve the functioning

---

[3] 42 U.S.C. § 1395y(a)(1)(A) states in part that "no payment may be made under [the Medicare statute] for any expenses incurred for items or services which ... are not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." Because this section contains an express condition of payment – that is, "no payment may be made" – it explicitly links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary."

of a malformed body member."]  (Emphasis added.); 42 C.F.R. § 411.15(k)(1) and made applicable to MA by 42 C.F.R. § 422.101(c)(1)-(3) ["Except as specified in §422.318 (for entitlement that begins or ends during a hospital stay) and §422.320 (with respect to hospice care), each MA organization must meet the following requirements: (1)  CMS's national coverage determinations; (2) **General coverage guidelines included in original Medicare manuals and instructions** unless superseded by regulations in this part or related instructions." (Emphasis added.)]; Medicare Managed Care Manual (MMCM), Ch. 4 § 10.2.

21.    Similarly, 42 C.F.R. § 411.15(k)(1) specifically excludes coverage from Medicare services that are not medically necessary and reasonable stating, "The following services are excluded from coverage: . . . (k) Any services that are not reasonable and necessary for one of the following purposes: (1) For the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member."

22.    The submission of claims for payment for medically unnecessary services (i.e., non-covered services) constitutes a fraud upon the Government.  42 U.S.C. § 1320a-7a(a)(1)(E) ["Any person (including an organization, agency, or other entity, but excluding a beneficiary, as defined in subsection (i)(5) of this section) that--(1) knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof . . . a claim (as defined in subsection (i)(2) of this section) that the Secretary determines--(E) is for a pattern of medical or other items or services that a person knows or should know are not medically necessary; shall be subject, in addition to any other penalties that may be prescribed by law, to a civil money penalty of not more than $20,000 for each item or service."].  Liability under the False Claim Act (FCA) extends to a MAO's subcontractor, such as defendants, without the requirement of presenting a claim directly to the Government.  31 U.S.C. § 3729(b)(2)(A).[4]

---

[4]31 U.S.C. § 3729(b)(2)(A);  *Universal Health Servs., Inc. v. United States*, 136 S.Ct. 1989, 1996, 195 L.Ed.2d 348 (2016) ["A 'claim' now includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs.  See §3729(b)(2)(A)."]

23.    Likewise, the Medicare Program Integrity Manual, Ch. 4 § 4.2.1 explains common types of Medicare fraud, stating in relevant part, "The most frequent kind of fraud arises from a false statement or misrepresentation made, or caused to be made, that is material to entitlement or payment under the Medicare program. The violator may be a provider/supplier. . . . **Providers/suppliers have an obligation, under law, to conform to the requirements of the Medicare program**.  Fraud committed against the program may be prosecuted under various provisions of the United States Code and could result in the imposition of restitution, fines, and, in some instances, imprisonment. In addition, a range of administrative sanctions (such as exclusion from participation in the program) and civil monetary penalties may be imposed when facts and circumstances warrant such action.  Fraud may take such forms as (this is not an exhaustive list):  Billing non-covered or non-chargeable services as covered items; and, Soliciting, offering, or receiving a kickback, bribe, or rebate (e.g., paying for a referral of patients in exchange for the ordering of diagnostic tests and other services or medical equipment)." (Remainder of list omitted;  Emphasis added.) Medicare Program Integrity Manual, Ch. 4 §4.2.1, available at www.cms.gov/Regulations-and -Guidance/Guidance/Manuals/Downloads/pim83c04.pdf.

24.    Services that are excluded from original Medicare's coverage are likewise excluded from an MA plan's coverage unless covered by that MA plan as a supplemental benefit that was previously submitted for CMS's approval as part of its bid submission. Social Security Act §1862(a)(1) [42 U.S.C. § 1395y]; 42 C.F.R. §§ 411.15(k)(1), 422.101(b)(1)-(3), 422.254(a);[5] MMCM, Ch. 4 §§ 10.2, 10.3.[6]

---

[5]Pursuant to 42 C.F.R. § 422.254, each MA plan must submit by June 1 of the prior year an actuarially certified bid of the monthly aggregate estimate of all revenue required to provide the benefits required under original Medicare and any supplemental benefits that plan wishes to offer. CMS can reject or accept the bid in its discretion.

[6]MMCM, Ch. 4 § 10.3 states in part, "Supplemental benefits: MA plans may choose to offer some benefits to enrollees in addition to the covered Medicare Part A and Part B (and Part D, as applicable) benefits they are required to offer if the item or service also meets the criteria described in sections 30 and 40 of this chapter. Supplemental benefits are further classified as either mandatory or optional: Mandatory supplemental benefits are benefits not covered under Part A, Part B, or Part D but are covered by the MAO for every person enrolled in the MA plan. Mandatory supplemental benefits are paid for either in full, directly by, or on behalf of, MA enrollees by premiums and

Medicare ESRD Coverage and Payment Requirements

25.     During 1972, the Social Security Act was amended to extended Medicare coverage to insured individuals, their spouses, and their dependent children with ESRD who require dialysis or kidney transplantation.  (Pub. L. 92-603).  The statutory authority for ESRD coverage is found in the Social Security Act (hereafter the "Act") Section 1861(e)(9) and (s)(2)(F) [42 U.S.C. § 1395x] and set forth in detail in 42 C.F.R. §§ 494.1-494.180.

26.     42 U.S.C. § 1320c-5(a)(1) states, "It shall be the obligation of any health care practitioner and any other person (including a hospital or other health care facility, organization, or agency) who provides health care services for which payment may be made (in whole or in part) under this chapter, to assure, to the extent of his authority that services or items ordered or provided by such practitioner or person to beneficiaries and recipients under this chapter-will be provided economically and only when, and to the extent, medically necessary."  In other words, a provider can not use a more expensive treatment or service when there is a lower cost equally effective treatment or medication is available absent a valid medical reason that is supportable by evidence.  Additionally, the statute requires each provider, including a dialysis facility such as DKC,  to impliedly certify (e.g., "to assure") that all claims for items or services are medically necessary as required by § 1320c-5.  This is in addition to the more general implied certification of compliance with all "applicable Federal, state and local laws and regulations pertaining to licensure and any other relevant health and safety requirements" set forth in 42 C.F.R. § 494.20 which is also a precondition to the Government's payment for Medicare covered items and services provided by dialysis facilities.

27.     CMS customarily pays 80% of healthcare costs under FFS Medicare and FFS Medicare patients (or their secondary Government Funded Payors or private insurance carriers, if any) pay the remaining 20%.  In many instances, the 20% co-pay and certain non-covered drug expenses is paid by Medicaid, Champus and ChampVA as the secondary payor.  Thus, in many instances, when providers submit fraudulent claims for reimbursement, loses are

cost-sharing, or through the application of rebate dollars."

-9-

incurred by the Government as both the primary and secondary payor and 100% of the loss caused by the fraud is passed directly to the taxpayers of the United States. Such losses also include false claims submitted by defendants to MAOs. *Universal Health Servs., Inc. v. United States*, 136 S.Ct. 1989, 1996, 195 L.Ed. 2d 348 (2016) ["A 'claim' now includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs. See §3729(b)(2)(A)."]

28.    At all times relevant, Medicare coverage is available for patients with ESRD who require dialysis or kidney transplantation. 42 C.F.R. § 494.1(a)(1). Prior to 2011, Medicare separately reimbursed dialysis providers for the medications required to treat ESRD. As a result, ESRD providers, such as defendants, had perverse financial incentives to increase profits by over-prescribing such medications. In order to curb these financial abuses, the Medicare Improvements for Patients and Providers Act of 2008 (MIPPA) amended section 1881(b) of the Social Security Act to require the implementation of an ESRD bundled payment system effective January 1, 2011 and changed the reimbursement method to ESRD facilities to what is known as the prospective payment system (PPS). Under MIPPA, the ESRD PPS replaced the prior payment system. The ESRD bundle provides defined items and services used to furnish outpatient maintenance dialysis to ESRD patients in an ESRD facility or a patient's home as defined in MIPPA and subsequent CMS regulations.[7] Social Security Act § 1881(b)14 [42 U.S.C. § 1395rr].

29.    The ESRD PPS provides a patient-level and facility-level adjusted per treatment (i.e., dialysis) payment to ESRD facilities for renal dialysis services provided in an ESRD facility or in a beneficiary's home. The bundled per-treatment payment includes certain drugs, laboratory services, supplies and capital-related costs related to furnishing maintenance dialysis. The ESRD PPS was phased in over a four year period beginning in 2011 and ending in 2014. 42 C.F.R. § 413.172(b) ["All approved ESRD facilities must accept the prospective

---

[7]CMS pays MAOs a capitated rate for their ESRD enrollees that takes into account the ESRD bundled services. A detailed description of the services covered under the ESRD bundle are found in the Medicare Benefit Policy Manual, Ch. 11 §§ 10(C), 20(A)-20(E), 70(B), available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/bp102c11.pdf.

payment rates established by CMS as payment in full for covered renal dialysis services as defined in §413.171 or home dialysis services."].  ESRD patients are not charged a 20% co-pay for the services provided under the ESRD bundle.

30.    A healthcare provider's certification that Medicare covered services are medically necessary and reasonable is an immutable requirement of 42 U.S.C. § 1395y(a)(1)(A) and is set forth as an express condition for any payment made under the Medicare program.  CMS and MAOs[8] require that every healthcare provider's claim for payment include a certification that such items and/or services were medically reasonable and necessary.  CMS's and MAOs' reliance on such certifications was and is reasonable because, among other things, falsely certifying medical necessity can result in (a) criminal liability, (b) civil liability, and (c) the provider's exclusion from Medicare and all Federally funded health care programs.  CMS and MAOs justifiably relied upon the certifications provided by the defendants that the services and items they billed for were medically necessary and reasonable.  Had CMS and the MAOs known that such certifications were false and the defendants were submitting claims for medically unnecessary premature dialysis, Sensipar and Renagel as alleged in the Complaint, CMS and the MAOs would have denied payment.  42 U.S.C. § 1395y(a)(1)(A).

31.    During 2008, CMS finalized new conditions of coverage for ESRD facilities providing dialysis treatment that where first introduced in 2005.  The new rules were published in the April 15, 2008 Federal Register, Vol. 73, at pages 20370-20454 as part of the "Medicare Program: Conditions for Coverage for End-Stage Renal Disease Facilities" (the "2008 Conditions of Coverage").  The 2008 Conditions of Coverage set forth rules that all ESRD facilities must meet in order to be certified under the Medicare program while strengthening ESRD patients' rights and clarifying the roles and responsibilities of ESRD facilities, and their medical directors, administrators and staff.

---

[8]42 U.S.C. § 1395y(a)(1)(A) also applies to MA ["Notwithstanding any other provision of this title . . . ."  *See also*, 42 C.F.R. § 422.101(b)(1)-(3); MMCM, Ch. 4 § 10.2 [MA payments to healthcare providers are contingent upon a determination that the service is, among other things, "reasonable and necessary."].

-11-

32.     As a result of the 2008 Conditions of Coverage, 42 C.F.R. § 494.80 requires, among other things:

> (1) that each ESRD facility must have an interdisciplinary team, consisting of, at the minimum, the patient or the patient's designee, a registered nurse, a physician treating the patient for ESRD, a social worker, and a dietitian;

> (2) within the first 30 days or 13 dialysis treatments, whichever is later, the interdisciplinary team must complete a comprehensive assessment of each of the ESRD facility's patients; and

> (3) the assessment must include, but is not limited to, the following:

>> (i) an evaluation of the appropriateness of the dialysis prescription;

>> (ii) an evaluation of factors associated with anemia, such as hematocrit, hemoglobin, iron stores and potential treatment plans for anemia;

>> (iii) an evaluation of factors associated with renal bone disease;

>> (iv) an evaluation of dialysis access type and maintenance;

>> (v) an evaluation of suitability for a transplantation referral, based on transplantation center criteria; and

>> (vi) documentation in the patient's medical record of any basis for nonreferral for kidney transplantation.  42 C.F.R. § 494.80(a)-(b).

33.     A follow up comprehensive reassessment must occur within 3 months after the completion of the initial assessment to adjust the patient's "plan of care" as set forth in 42 C.F.R. § 494.90 and at least annually thereafter.   42 C.F.R. § 494.80(b).

34.     As a result of the 2008 Conditions of Coverage, 42 C.F.R. § 494.90 requires, among other things, that:

> a.     The interdisciplinary team develop and implement a written, individualized comprehensive plan of care that specifies the services necessary to address each ESRD patient's needs, as identified by the

-12-

comprehensive assessment;[9]

    b.    The plan of care must include measurable and expected goals and objectives and estimated timetables to achieve these outcomes;

    c.    The outcomes specified in the patient plan of care must be consistent with current evidence-based professionally-accepted clinical practice standards; and

    d.    If the patient is unable to achieve the plan of care's goals and objectives, the reasons why must be documented and an amended plan of care implemented which is intended at addressing such reasons.

35.    The plan of care must include but is not limited to all of the following: (a) dialysis dose and frequency, (b) nutritional status, (c) mineral metabolism and prevention of renal bone disease, (d) anemia, (e) vascular access, and (f) a plan for achieving a kidney transplant unless it is documented that the patient is not a transplant candidate and that status remains unchanged.

36.    Each of the members of the interdisciplinary team must sign the ESRD facility's plan of care.  42 C.F.R. § 494.90(b).

37.    As a result of the 2008 Coverage Conditions, 42 C.F.R. § 494.150 requires that each  ESRD facility have one medical director who is ultimately responsible for delivery of all dialysis treatment and services to the facility's ESRD patients and is accountable to the ESRD facility's governing body.[10]

---

[9] 42 C.F.R. § 494.90(a)(7)(ii) requires, " When the patient is a transplant referral candidate, the interdisciplinary team must develop plans for pursuing transplantation. The patient's plan of care must include documentation of the--
(A) Plan for transplantation, if the patient accepts the transplantation referral;
(B) Patient's decision, if the patient is a transplantation referral candidate but declines the transplantation referral; or
(C) Reason(s) for the patient's nonreferral as a transplantation candidate as documented in accordance with §494.80(a)(10)."

[10] In discussing the adoption of §494.150, CMS states "In response to comments, we have added language at §494.150 to state explicitly that ''The medical director is accountable to the governing body for the quality of medical care provided to patients.'' In addition, the medical director has the responsibility of ensuring that all policies and procedures relative to patient care and safety are followed by all who treat the patient, as required at §494.150(c)(2). **This modification clearly holds**

-13-

38.     The medical director must, among other things, participate in the development of "patient care policies and procedures manual" for the facility and must also ensure that all policies and procedures relative to patient care are adhered to by all individuals who treat patients in the facility, including attending physicians and non-physician providers. 42 C.F.R. § 494.150(c).  The purpose of this requirement is to make clear that the ESRD facility and its medical director were responsible for prescribing, delivering and overseeing the dialysis treatments given to ESRD patients.  *See,* fn 10 ante.

Dialysis Overview

39.     The loss of kidney function is usually irreversible.  Kidney failure is typically caused by Type I and Type II diabetes, high blood pressure, polycystic kidney disease, long-term autoimmune attack on the kidney or prolonged urinary tract obstruction.  Kidney failure, also known as End Stage Renal Disease or ESRD, is the stage of advanced kidney impairment that requires continued dialysis treatments or a kidney transplant to sustain life. Left untreated, ESRD patients will develop uremia, i.e., a toxic build up of creatinine and urea in the blood stream, and is a life threatening condition.  Patients suffering from uremia must undergo dialysis to reduce the levels of toxins in their blood stream.  Dialysis is the process of removing of toxins, fluids and salts from the blood of ESRD patients by artificial means. Patients suffering from ESRD generally require dialysis at least three times a week for the rest of their lives.  The vast majority of dialysis treatments in the United States are performed in dialysis centers (also referred to as dialysis clinics).  ESRD patients typically undergo a procedure called hemodialysis, which is a medical procedure that uses a dialysis machine to filter waste products from the blood and restore its normal constituents.

40.     As part of the dialysis treatment, blood is taken from the patient, typically by use of an arteriovenous fistula (fistula) or catheter, cleaned through an artificial filter and returned back into the patient's body.  This process typically last lasts three to four hours for

---

**the medical director responsible for the care that is furnished.** Each facility must have a single medical director to carry out the responsibilities of this position." (Emphasis added.) 73 Fed.Reg. 20340, 20427 (April 15, 2008).

1    each session and must be performed at least three times a week.   The fistula is a permanent

2    shunt surgically implanted into the patient's artery, typically in the patient's upper arm, which

3    connects an artery directly to a vein to allow access for hemodialysis.  The fistula takes three

4    to four months to mature sufficiently to be used for hemodialysis.  The fistula is the preferred

5    method for long term vascular access for ESRD patients that are candidates for this procedure.

6    Medical Necessity In the False Claims Act

7        41.    The lack of medical necessity is a well established basis for liability under the

8    False Claims Act (FCA). *See, Frazier ex rel. United States v. Iasis Healthcare Corp.*, 392

9    Fed.Appx. 535, 537 (9th Cir. 2010) [allegations the defendant submitted claims that were

10   known to be medically unnecessary adequately pleads a FCA violation];  *United States ex rel.*

11   *Kneepkins v. Gambro Healthcare, Inc.*, 115 F.Supp.2d 35, 41-42 (D.Mass. 2000) [medical

12   procedures that are deleterious or performed solely for profit are not medically necessary];

13   *United States ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004);

14   *United States ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 741-42 (10th Cir. 2018)

15   [collecting cases].  Medical necessity is an immutable cornerstone for the coverage and

16   payment of any services provided under Medicare.   42 U.S.C. § 1395y(a)(1); 42 C.F.R.

17   411.15(a)(1)[11].  As a result of the forgoing, establishing that items and services are medically

18   necessary and reasonable are an expressed prerequisite to payment under Medicare.

19       42.    However, just because a physician believes an item or service is medically

20   necessary does not mean that it is covered or reimbursable under Medicare.  42 U.S.C. § 1395y

21   and 42 C.F.R. § 411.15  list the services that are excluded from Medicare's coverage and are

22   therefor not reimbursable.  For a Medicare covered item or service to be reimbursable it has

23   to comply with the provisions of 42 U.S.C. § 1320c-5 which requires, in relevant part, that any

24

25       [11]42 U.S.C. § 13295y(a)(1)(A) states "**(a) Items or services specifically excluded-**
    Notwithstanding any other provision of this subchapter, no payment may be made under part A or part

26   B of this subchapter for any expenses incurred for items or services--(1)(A) which, except for items
    and services described in a succeeding subparagraph . . . , are not reasonable and necessary for the

27   diagnosis or treatment of illness or injury or to improve the functioning of a malformed body
    member." Similarly, 42 C.F.R. § 411.15(a)(1) excludes from coverage any item or service that is not

28   medically necessary or reasonable (i.e., "Examinations performed for a purpose other than treatment
    or diagnosis of a specific illness, symptoms, complaint, or injury, . . . .").

provider, including but not limited to defendants, must impliedly certify that all items and services ordered or provided to Medicare beneficiaries "will be provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1). As a result, the provision of items or services that are deleterious, inferior and/or provided for the purpose of increasing reimbursement from a Government funded health care program are not medically reasonable nor necessary. *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F.Supp.2d 35, 42 (D.Mass. 2000). Likewise, the submission of claims for such services results in false express and implied certifications in violation of the FCA. *Id.*; 42 U.S.C. §§ 1395y(a)(1)(A) and 1320c-5(a)(1). FCA liability based on the lack of medical necessity does not involve a debate regarding the applicable standard of care. Rather, such cases turn on a showing that the items or services were provided to increase profits because such services were of little or no value, were deleterious or there were more economical options that were as efficacious. *See, Id.* at 42-43; *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376–77 (5th Cir. 2004), ["Riley's complaint does sufficiently allege that statements were known to be false, rather than just erroneous, because she asserts that Defendants ordered the services knowing they were unnecessary."]

Overview of Allegations

43.    The allegations contained in this Second Amended Complaint (SAC) all involve the provision of medically unnecessary medications or treatments prescribed or rendered for the purposes of increasing revenues in violation of 42 U.S.C. §§ 1395y(a)(1)(A) and 1320c-5(a)(1) despite the fact safer, equally efficacious and less expensive medications and treatments were readily available. The SAC accuses the defendants of knowingly providing medically unnecessary prophylactic dialysis treatments and medications in order to maximize DaVita, DKC and DRX's Medicare reimbursement from the Government and other Government funded payors despite knowing that landmark medical research conclusively proved that prophylactic dialysis treatments were potentially harmful and of no medical benefit, that Sensipar failed to reduce cardiac related ESRD co-morbidities as originally believed, and ample medical research documenting the efficaciousness and safety of using

-16-

over the counter (OTC) phosphate binders , such as Tums, to treat ESRD patients as opposed to much more expensive prescription phosphate binders, such as Renagel.

44.    Specifically, the SAC makes three primary allegations. **First,** during and between 2011 and the continuing until at least the present, DaVita through its subsidiary DKC routinely initiated prophylactic dialysis by starting ERSD patients dialyses treatments six months to one year in advance of any clinical symptoms indicating that the patients needed to be dialyzed.   These prophylactic dialysis treatments were done to increase the revenues and profits of DaVita, DKC, DRX, and the ESRD patient's treating nephrologists.  The premature initiation of dialysis provided no clinical medical benefits but needlessly exposed such patients to risks of complications associated with dialysis, risks of needlessly damaging or compromising their physical access to dialysis treatments as well as needlessly forcing such patients to endure thrice weekly, prolonged dialysis treatments. **Second**, during and between 2008 and 2017, DaVita through its subsidiaries DKC and DRX routinely prescribed and furnished Sensipar, a drug that was claimed to reduce ESRD patients' cardiac events caused by increased levels of parathyroid hormones.  The drug costs of approximately $8,400 per patient per year.  The 2008 landmark study underwritten by Amgen, Sensipar's manufacturer, debunked such claims and showed the drug had no impact in reducing the number or severity of ESRD patients' cardiac events.  Despite these findings,  DaVita, DKC and DRX continued to routinely recommend, prescribe and furnish Sensipar to its ESRD patients until 2018 when the initial phase in of Sensipar into the ESRD PPS bundle started, changing the economics of Sensipar from an additional source of DaVita revenue to an added expense. **Third**, during and between 2008 and 2017, DaVita through its subsidiaries,  DKC and DRX, routinely prescribed and furnished Renagel, a prescription phosphate binder.  Renagel costs approximately $8,400 per-patient-per-year.   DaVita,  DKC and DRX continued to routinely recommend, prescribe and furnish this drug to DaVita's ESRD patients despite the fact that the vast majority of ESRD patients could achieve the same results for the first three to four years of their dialysis treatments with over the counter (OTC) antacids such as TUMS and experience fewer side effects.  DaVita, DKC and DRX continued to routinely recommend, prescribe and furnish

-17-

Renagel to its ESRD patients until 2018 when the initial phase in of Renagel into the ESRD PPS bundle started changing the economics of Renagel from an additional source of DaVita revenue to an added expense.

45.     The medically unnecessary services and prescription medications were recommended, performed, prescribed and furnished to DaVita's ESRD patients for the purpose of increasing defendants' profits.  In the case of the two prescription medications, Sensipar and Renagel, this is evidenced in part by the fact that as of 2018 the use of these drugs stopped as soon as prescribing Sensipar and Renagal were no longer a source of additional revenue for defendants.  Beginning in 2018, Sensipar and Renagel cost and expense were being phased into the ESRD PPS bundle, 25% beginning in 2018 and 100% beginning in 2019.  That meant 25% of Sensipar's and Renagel's cost was shifted to DaVita and DKC.  Any profit made by DRX resulting from volume discounts and allowed surcharges were wiped out by the 2018 partial cost shift into the ESRD prepaid bundle.  In response, DaVita closed DRX to prevent the medications from being furnished to DaVita's ERSD patients and DKC's interdisciplinary teams stopped requesting authorizations for prescriptions for Sensipar and Renagel.

DaVita, DKC and DRX's Medically Unnecessary Prophylactic Dialysis

46.     As previously discussed in ¶¶ 32 through 38,  in accordance with the ESRD patients' rights, each ESRD patient is given a comprehensive assessment from which DKC's interdisciplinary team develops a plan of care setting forth the timing and treatment objectives of the patient's dialysis treatments.  42 C.F.R. §§ 494.70 through 494.90.  The adequacy of the patients' dialysis treatments are required to be assessed by DKC's interdisciplinary team on an ongoing basis (at least monthly for hemodialysis patients and at least every four months for peritoneal dialysis patients) by calculating the weekly delivered Kt/V.[12] 42 C.F.R. § 494.80(c). The comprehensive assessments are repeated at least annually for stable patients and monthly if there is a hospitalization, significant change or deterioration of the patient's condition.  *Id.*

[12]The *Kt/V* ratio is a number used to quantify hemodialysis and peritoneal dialysis treatment adequacy. *K* – dialyzer clearance of urea; *t* – dialysis time; *V* – volume of distribution of urea, The normal range is a *Kt/V* ratio greater than 1.2. An unexplained decrease of Kt/V of more than 0.2 or a decrease of Kt/V below 1.2 is a clinical indication that patients dialysis access is not functioning properly.

at (d).

47.    DKC clinics are responsible, via their facilities' medical directors, for ensuring the quality of patient care, patient safety and the related clinical policies and procedures.  42 C.F.R. §§ 494.150 and 494.180.  Likewise, DKC's medical directors are required to participate in the development of the facilities' clinical policies and procedures, and participate in the annual review and/or amendments of such policy and procedures. 42 C.F.R. § 494.150. However, the medical directors' most significant responsibility is that they must ensure that all members of the dialysis facility's interdisciplinary team and all medical providers, whether employed or outside contractors, adhere to and follow the dialysis facility's clinical policies and procedures regarding dialysis treatments.  *Id.* at (c).  §494.150 was enacted to purposefully vest responsibility for dialysis treatment decisions, such as when dialysis should be initiated, in the dialysis facilities' medical directors as opposed to the patient's treating nephrologists. *See,* footnote 10 *supra, citing* 73 Fed.Reg. 20340, 20427 (April 15, 2008).  In contrast, the patient's treating nephrologist's responsibilities are as a member of the patient's interdisciplinary team and the requirements and duties thereof as set forth in 42 C.F.R. §§ 494.80 and 494.90.

48.    At all times 42 C.F.R. 494.150 required DKC's medical directors to adopt policies for initiating dialysis in compliance with the mandates of 42 U.S.C. § 1320c-5, including but not limited to assuring that all items and services the ESRD Medicare beneficiary received are "provided economically and only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a)(1). Beginning in at least 2008 and continuing until the present, DaVita and DKC have maintained their long standing policy of initiating dialysis prophylactically, in advance of the ESRD patient having clinical symptoms requiring such patients to be dialyzed.  Instead of waiting for the ESRD patients to exhibit the clinical symptoms caused by the onset of uremia,  DaVita and DKC dialysis facilities advocate initiating dialysis as soon as the patient's GFR is at 15 mL/min and in some cases even sooner. (*See*, footnote 13 at page 21.)  This policy which was based upon the 2006 National Kidney Association Guidelines, was never supported by any medical research or scientific studies.

However, in 2010 the results of a landmark study undertaken to determine the appropriate time to initiate dialysis were published in New England Journal of Medicine. (See, ¶¶51-52 below.) The conclusive results showed that there was no benefit of any kind to premature prophylactic dialysis initiation and further that it was very likely harmful to seniors and other vulnerable patients. Subsequent studies validated such conclusions regarding the lack of benefit from premature prophylactic dialysis initiation and further concluded such initiations of dialysis were in-fact harmful to senior and ESRD patients.

49.    As a result of credible medical research available in 2010 determining that dialysis should be initiated upon the onset of clinical symptoms caused by the onset of uremia, DaVita, DKC and its medical directors were required to adopt policies to initiate dialysis upon the onset of uremia, and discontinue and prohibit further medically unnecessary prophylactic dialysis initiations. For the most part this has not occurred. Dr. Holzner estimates that during and between 2010 until the present approximately 30% of all dialysis provided by DKC to DaVita's ESRD patients are medically unnecessary prophylactic dialysis treatments. Such prophylactic dialysis treatments were provided solely to generate additional revenues from Medicare and other Government funded payors by DaVita, DKC and nephrologists that refer patients to DKC dialysis facilities. The annual cost per dialysis patient is approximately $45,000 per year with total ESRD patient expenditures costing on average $90,000 per patient per year. Once dialysis is initiated, treatments will typically continue three times a week for the rest of the patient's life.

50.    In 2010, the New England Journal of Medicine published the results of The Initiating Dialysis Early and Late (IDEAL) study, an extensive eight year long randomized controlled study designed to determine whether initiating dialysis prematurely in people with stage V chronic kidney disease reduces the rate of death from any cause. The study's secondary aims were to determine whether premature initiation of dialysis is associated with a reduction in cardiovascular and infectious events and/or in complications of dialysis. New Eng. J. Med. Vol. 363, pp. 609-19 at p. 609 (August 12, 2010). Prior to the IDEAL study this important question had not been well investigated. Instead, unverified and unscientific

-20-

conservative guidelines were typically used resulting in ESRD patients frequently receiving medically unnecessary prophylactic dialysis treatments. Conclusively determining when it is medically necessary to initiate dialysis has significant impact on the quality of life and activities the ESRD patient can continue to participate in and also significantly impacts Medicare's total ESRD treatment costs.

51.    The IDEAL study found that during 2005, approximately 40% of ESRD patients had their dialysis started prophylactically (i.e., in advance of any clinical findings that uremia had developed) under the then unconfirmed belief that this premature start of dialysis would improve the mortality of ESRD patients. DaVita and DKC were major proponents of this type of prophylactic dialysis. By 2010, the IDEAL study confirmed for the international medical community that initiating dialysis in advance of the patient having elevated levels of creatinine and urea without clinical findings of the onset of uremia[13] had no positive impact on patients' mortality and resulted in a higher number of complications and other co-morbidities instead of a lower number as had been hoped.

52.    The uncontroverted findings of the IDEAL study, which proved that premature, prophylactic, dialysis treatments were medically unnecessary and of no benefit, required DaVita and DKC to prohibit medically unnecessary, premature and prophylactic dialysis initiations and adopt the well-established and then confirmed protocol to start dialysis only when the patient is diagnosed with uremia based on clinical findings discussed in footnote 13 *ante.* Failure to timely make this policy change meant that many of DKC's dialysis treatments were medically unnecessary in violation of 42 U.S.C. §§ 1395y(a0(1)(A), 1320c-5(a)(1), in addition to violating the False Claim Act. 31 U.S.C. § 3729(a)(1)(A),(B) and (G).

---

[13]The clinical findings used to detemine when to initiate dialysis is the creatinine and urea clearance levels estimated by the glomerular filtration rate (GFR) which estimates the rate the kidneys remove these toxins from the body. In 2006, the 2006 National Kidney Association guidelines suggested considering dialysis when the GFR is at 15 mL/min. This figure has been conclusively rejected by the IDEAL study which recommends that patients be closely monitored and dialysis initiation begins upon the patient having the onset of uremia, fluid overload or other clinical findings that require immediate dialysis treatment. Further target GMR should be no more 7 mL/min but can be electively delayed to a lower GFR if the patient does not present the clinical symptoms requiring dialysis (i.e., onset of uremia, fluid overload or other clinical findings that require immediate dialysis.) New Eng. J. Med. Vol. 363 at pp. 615-616.

53.    Moreover, as previously discussed in ¶¶ 32-38 and 47-48, DKC's medical directors are responsible for creating policies and procedures governing, among other things, when and under what criteria dialysis will be initiated and more importantly, ensuring that their facility's interdisciplinary teams and all medical providers participating in such teams adhere to such policies.  DKC's medical directors are accountable to a governing body (i.e., DaVita) for the quality of medical care provided to patients. If DKCs' medical directors failed to adopt or failed enforce policies and procedures prohibiting medically unnecessary, premature and prophylactic dialysis initiation after the dissemination of the IDEAL study, DaVita as the responsible governing body had to address the problem.  42 U.S.C. § 494.180. .

54.    During 2010, Dr. Holzner help convince some of the DKC medical directors that he worked closely with to discontinue providing medically unnecessary premature dialysis initiations based on the evidence published in the IDEAL study.  However, Dr. Holzner subsequently learned from discussions with DKC medical directors, DaVita's Chief Medical Director, Allen Nissenson, M.D., and information published on DaVita's own website that DaVita and DKC dialysis facilities have continued until the present to advocate providing medically unnecessary, premature and prophylactic dialysis initiations nationwide.

55.    Subsequent research studies have confirmed the IDEAL study's conclusions, noting that from 1996 to 2008 there was a dramatic increase in premature initiation of hemodialysis (i.e., starting dialysis at GFR between 15 and 10 mL/min) despite there being no evidence to support any benefits from earlier initiation and several articles suggesting it was harmful.  See, Early Start of Hemodialysis May Be Harmful, Arch Intern Med. (March 14, 2011), Vol. 171, No. 5, pp. 396-403 (published by Journal of the American Medical Association (JAMA) Internal Medicine) published online November 8, 2011, available at https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/226795?alert=article.)[14] The researchers of Early Start of Hemodialysis May be Harmful found that the first year mortality of ESRD patients who received premature and prophylactic initiations of

---

[14]The authors of, Early Start of Hemodialysis May be Harmful, limited their cohorts to the healthiest possible ERSD patients by removing those age 65 and older.

hemodialysis was three times higher than with those ESRD patients whose initiation was at the onset of uremia. *Id.* at p. 403. The study concluded that even for the healthiest patients, the data showed that the premature initiation of hemodialysis was dangerous and further that hemodialysis should be initiated with the onset of uremia, stating, "Initiation of hemodialysis should not be based on an arbitrary level of eGFR or serum creatinine level unless this measure is accompanied by definitive end-stage renal failure–related indications for hemodialysis." *Id.* at p. 403.

56.    To date, DaVita and DKC continue to initiate premature dialysis treatments to their ESRD patients. As a result, approximately 30% of DaVita and DKC dialysis treatments are medically unnecessary premature initiations of dialysis treatments performed without the patient needing or benefitting from the premature dialysis treatments. *Id.*[15] DaVita and DKC's callous pursuit of profits reprehensibly exploited vulnerable, chronically ill ESRD patients to undergo medically unnecessary premature dialysis.[16] As the nation's largest provider of dialysis services, DaVita and DKC's actions also resulted in one of the largest frauds perpetrated on the Medicare program and secondary Government Funded Payors. Dr. Holzner estimates that DaVita and DKC's medically unnecessary premature dialysis initiations cost the Government between $1.12 and $2.25 billion dollars per year for each of the last eight years. This estimate is based on 50,000 annual ESRD patients given medically unnecessary, premature and prophylactic administrations of dialysis treatments for six months to one year at an annual cost of $45,000 per patient.

DaVita, DKC and DRX's Medically Unnecessary Use of Sensipar

57.    ESRD causes many significant physiological problems. One such problem is the kidneys' failure to produce vitamin D, which is necessary for the body to metabolize calcium. The lack of vitamin D causes calcium to be leached from the bones, making them weak and

---

[15]The IDEAL study concluded that approximately 45% of the dialysis treatments were started premature resulting in six months to one year of medically unnecessary dialysis treatments for such patients.

brittle.  In response to low calcium levels, the parathyroid gland produces more parathyroid hormone (PTH), which increases serum calcium levels by demineralizing bone.  Increased levels of PTH are characteristic of patients with ESRD.  This constant over-taxing of the parathyroid eventually leads to secondary hyperparathyroidism.  Some ESRD patients develop tertiary hyperparathyroidism, where the parathyroid produces PTH autonomously, regardless of calcium levels.  Tertiary hyperparathyroidism can only be cured by surgically removing the parathyroid.  To help mitigate these symptoms, ESRD patients are given calcium supplements and vitamin D is added to their dialysate.  Taking high doses of calcium may lead to calcium toxicity, which can cause calcium deposits to form in the patient's vascular system and corneas of the eyes.  Dangerous levels of calcium usually take four to five years to manifest.  ESRD patients must closely monitor their Vitamin D, calcium and phosphorus levels.  Managing these levels are a constant challenge for ESRD patients and their healthcare providers.

58.     Cardiovascular co-morbidities are a common cause of death in ESRD patients. Although this causal link is well documented, the mechanisms causing cardiovascular co-morbidities in ESRD patients are not understood and there are no proven therapies.

59.     Cinacalcet, manufactured under the brand name Sensipar by Amgen, was introduced during or about 2002 specifically to reduce ESRD patients' cardiovascular co-morbidities by lowering parathyroid hormone (PTH) levels in ESRD patients suffering from secondary hyperthyroidism.  Approximately 50% of DaVita and DKC's ESRD patients have elevated levels of PTH and are prescribed Sensipar.  When Sensipar was originally introduced it was believed that reducing ESRD patients' PTH levels would reduce cardiovascular co-morbidities and events, and thereby measurably improve the morbidity of ESRD patients. Reducing cardiovascular co-morbidities and events by lowering ESRD patients' PTH levels was the sole reason for prescribing ESRD patients Sensipar.  There is no other medically indicated nor medically necessary reason to prescribe Sensipar to ESRD patients, and it is not prescribed to non-ESRD patients.

60.     The first major double blind study designed to investigate Sensipar's effectiveness on improving ESRD patients' mortality by reducing their cardiovascular co-

morbidities by reducing PTH levels was the Phase 3, EVOLVE (i.e., EValuation Of Cinacalcet HCl Therapy to Lower CardioVascular Events) trials, underwritten by Amgen, Sensipar's manufacturer. The results of the EVOLVE trials were published by the New England Journal of Medicine on November 3, 2012 and conclusively proved that although Sensipar reduced PTH levels in ESRD patients, such reduction in PTH levels had no effect on reducing cardiovascular co-morbidities events, and therefore made no improvement in ESRD patients' morbidity. The EVOLVE trial established that Sensipar failed to make any impact on reducing ESRD patients' cardiovascular co-morbidities, does not reduce the frequency or severity of cardiac events nor does it prolong the life span of ESRD patients. New Eng. J. Med. (Nov. 3, 2012), Vol. 367, pp. 2482-94. Since Sensipar is not efficacious to treat the problems it was intended it cannot be medically reasonable or necessary to continue to prescribe Sensipar to ESRD patients to reduce cardiovascular co-morbidities or generally to improve the life span of ERSD patients. Sensipar is not prescribed to non-ESRD patients.

61. During and between 2013 and 2017, DaVita and DKC failed to prohibit its employed medical directors, nurse practitioners (NPs), dieticians and contracted and/or affiliated physicians from prescribing medically unnecessary Sensipar. Moreover, during such time period, Dr. Holzner is informed and believes and based upon such information and belief alleges, that DaVita and DKC promoted and/or instructed its employed medical directors, NPs, dieticians and contracted and/or affiliated physicians to prescribe Sensipar to all of their ESRD patients with elevated PTH levels purportedly to reduce such ESRD patients' cardiovascular co-morbidities and thereby improve their mortality. Prior to 2013, Sensipar was prescribed to ESRD patients despite the lack of evidence or medical research establishing a causal link between elevated PTH levels and cardiac co-morbidities in ESRD patients (or any other types of patients.) The 2012 EVOLVE trials conclusively proved that no such causal link existed and made clear that Sensipar was not efficaciousness and failed to reduce the cardiac events and improve cardiac co-morbidities as intended. After the EVOLVE trials publication, DaVita and DKC's decision to allow their employed medical directors, NPs, dieticians and contracted and/or affiliated physicians to continue prescribe medically unnecessary Sensipar was purely

for DaVita, DKC and DRX's financial gain.

62.    Sensipar was all times relevant before 2018, excluded from the ESRD PPS payment bundle.[17]  As a result, DKC and DRX billed the Government and other Government funded payors separately for Sensipar at 6% above the manufacturer's Average Sales Price (ASP) for Sensipar reimbursement.  This surcharge combined with the wholesale volume discount DRX was able to obtain from being one of the major purchasers of Sensipar created a tremendous financial incentive for DaVita to continue to have its subsidiaries prescribe and furnish the medically unnecessary Sensipar after the EVOLVE trials publication.[18]

63.    Typically, the patients' interdisciplinary team's DKC-employed dieticians made the initial order for the patient's Sensipar prescription.  This order was for at least a month's-plus supply and was immediately forwarded to DRX to furnish the medication by drop shipping the Sensipar directly to the patient's home.  It was customary for the treating nephrologists to forgo attending the statutorily required weekly interdisciplinary team meetings to review the adequacy of the dialysis treatments pursuant to 42 C.F.R. § 494.90(a)(1) because the nephrologists are not compensated by Medicare nor DKC for attending.[19]  Instead the patient's treating nephrologist typically made unscheduled monthly or more frequent visits to the DKC dialysis facility to sign previously filled prescriptions for Sensipar.  Once started on Sensipar, DKC's systems were set up to continuously drop ship the medications to the patient's home typically for the remainder of the patient's life, (the National Kidney Foundation

---

[17]Sensipar began a two year phase-in into the ESRD bundle coverage starting in 2018.

[18]At an estimated 14% wholesale volume discount price, said defendants derived approximately $100 million per year of additional profit (after deducting the cost acquiring the Sensipar) from medically unnecessary Sensipar prescriptions.  Due to Sensipar's expense and said defendants' pervasive use of this medically unnecessary drug, the additional cost to Government and MA plans for such Sensipar prescriptions is estimated to be in excess of $500 million per year for each of the last six years.  This estimate is based on Sensipar at $8,400 per year per patient for approximately 60,000 patients.

[19]In contrast, treating nephrologists receive compensation from Medicare or other Government funded payors of approximately $150.00 for every patient's dialysis sessions.  This can be a significant part of the nephrologist annual compensation because each such patient receives three to four dialysis sessions per week.  The nephrologists is not required to be present in order to bill and receive this compensation but can increase the amount to include a consultation fee if they have a brief face-to-face encounter with the patient while dialysis is being administered.

estimates that the average life expectancy of an ESRD patient on dialysis is five to ten years.) Dr. Holzner has also been informed and believes and upon such information and belief thereupon alleges, that such Sensipar shipments from DRX to patients' homes were for quantities in excess of what the patient was supposed to consume during the prescribed period, creating a stockpile of the medication or overuse of the medication by the patient.

64.     As previously discussed in ¶62, Sensipar was a source of additional revenue to DaVita because (a) DKC was allowed to bill the Government and other Government funded payors separately for Sensipar at 6% above the manufacturer's Average Sales Price (ASP), and (b) DRX was able to volume wholesale discounts from being one of the major purchasers of Sensipar.  This came to an end beginning in 2018 when 25% of the Sensipar's cost was shifted into the ESRD PPS bundle, as part of a two year phase in. Relator is informed and believes and upon such information and belief alleges that such cost shift offset the additional revenue generated by prescribing Sensipar and made its continued use an additional expense to DaVita. As a result, beginning in 2018 DaVita discontinued DRX's operations and instructed DKC to no longer have its interdisciplinary teams request or authorize prescriptions for Sensipar.

65.     Sensipar's immediate disuse by DaVita, DKC and DRX concurrent with Sensipar no longer being a source of additional revenue, due to the partial cost shift,  is evidence that its continued use following the publication of the EVOLVE  trials (i.e., during and between 2013 and 2017) was to improperly increase revenues and further evidence of knowledge regarding  the drug's lack of medical necessity.  Despite knowing, as a result of the EVOLVE trials at the end of 2012, that reducing ESRD patients' PTH levels with Sensipar had no impact on the such patients mortality nor reduced the number or severity of cardiac events as originally believed, DaVita, DKC and DRX continued to request, prescribe and furnish medically unnecessary Sensipar during and between 2013 and 2017 to most of their ESRD patients with elevated PTH levels.

66.     Similarly, DaVita has been a partner in a MA Special Needs Plan (SNP) with SCAN Healthplan located in Long Beach, California since about 2007 and continuing to the present. For the SNP, drugs that are not in the ESRD bundle, such as Renagel and Sensipar,

are an additional expense to the SNP, which was partially owned by DaVita.  DaVita and DKC's interdisciplinary teams assigned to the DaVita-SCAN MA SNP patients, did not prescribe Sensipar, and prescribed OTC calcium based phosphate binders, such as Tums, instead of Renagel, except when medically necessary because the patient could no longer tolerate such calcium based medications.  However California's Medicaid program known as Medi-Cal, would cover the cost of Sensipar for dual eligible patients (i.e., patients enrolled in Medicare and Medi-Cal.) As a result, during and between 2012 and 2017 the DaVita SNP's interdisciplinary teams prescribed Sensipar to its dual eligible patients.  This practice stopped in 2018 when Sensipar started to be phased into the ESRD PPS bundle.  The non-use of Sensipar and primary use of OTC phosphate binders instead of Renagel is the correct course of action for Medicare ESRD patients because 42 U.S.C. § 1320c-5(a)(1) requires that economical treatments be chosen to satisfy medical necessity.  Dr. Holzner is informed and believed and upon such information and belief thereupon alleges, that during and between 2012 and 2017 there were no peer reviewed medical research or other evidence that supported Sensipar's manufacturer's claims that Sensipar was efficacious for reducing cardiac co-morbidities in ESRD patients nor in improving such patient's life spans as promoted.  *See,* ¶ 26 ante.

67.    DaVita and DKC's interdisciplinary teams' actions of not recommending or prescribing Sensipar and primarily prescribing OTC phosphate binders instead of Renagel to DaVita-SCAN MA SNP patients when DaVita is financially on the hook for the expense, but aggressively recommending and prescribing Sensipar and Renagel whenever it can be billed separately and serve as a source of additional income, is evidence of DaVita and DKC's knowledge that such medications are not, in-fact, medically necessary, cost-effective and efficacious.  Further, such actions are evidence of defendants' knowledge and fraudulent intent to recommend and over-prescribe Sensipar and Renagel for profit although it was not cost effective, efficacious nor medically necessary to do so.

68.    As previously discussed in ¶¶32-38 and 47-48, DKC's medical director is responsible for the ESRD patient's quality of care and must develop policy and procedures that

-28-

prohibit the use of medically unnecessary medications such as Sensipar.  42 C.F.R. § 494.150. DKC's medical director must also ensure that the interdisciplinary team, including the patient's treating nephrologists, adhere to such policies and procedures.  *Id*. at §494.150(c)(2).  Based on the New England Journal's publication of the EVOLVE trials informing DaVita and DKC that Sensipar had no impact at reducing the number or severity of cardiac events and failed to improve  ESRD patients' mortality rates, as of 2013, DaVita and DKC should have required its medical directors to adopt policies and procedures that prohibited using, prescribing and furnishing medically unnecessary Sensipar to DKC's ESRD patients.  Further, DaVita and/or DKC had to ensure that its medical directors required adherence to such policies and procedures by DKC's employees and employed and contracted nephrologists that participated as DKC interdisciplinary team members.

69.     DaVita and DKC failed to implement the above described changes to discontinue recommending, prescribing and furnishing medically unnecessary Sensipar to their ERSD patients. Instead, DaVita and DKC maintained the status quo and continued to recommend and prescribe Sensipar to their patients with elevated PTH levels (i.e., approximately 50% of their ESRD patients) for as long as Sensipar was an additional source of revenue.   The EVOLVE trials that Amgen sponsored and published in the New England Journal of Medicine proved that reducing PTH levels with Sensipar had no effect in reducing the frequency or severity of ESRD patients cardiovascular co-morbidities nor improved the mortality of such ESRD patients. Since reducing cardiac co-morbidity was the specific reason for prescribing Sensipar, the EVOLVE trials' repudiation of Sensipar's efficaciousness made its continued use medically unnecessary.  As a result, during and between 2013 and 2017 all  DaVita, DKC and DRX's claims for Sensipar submitted to Medicare and other Government funded payors contained false statements and false implied and express false certifications in violation of 42 U.S.C. §§ 1395y(a)(1)(A), 1320c-5(a)(1) and the False Claims Act.   Had CMS known that Sensipar was not medically necessary for DaVita's and DKC's ESRD patients, CMS would have denied all claims for payment because medical necessity is an expressed condition precedent to all Medicare payments pursuant to 42 C.F.R. § 1395y(a)(1)(A).

-29-

70.    As a result of Relator's own research and investigations and from discussing the topic with numerous DaVita and DKC nephrologists during and between 2007 and 2017, Relator confirmed that Sensipar was routinely prescribed and furnished to most of DaVita's and DKC's ESRD patients with elevated PTH levels.  This practice was nationwide and continued at most DKC locations after the publication of the EVOLVE trials until the first year of Sensipar's cost being phased into the ESRD PPS bundle.  The continued prescribing and furnishing of Sensipar during and between 2013 and 2017 was unquestionably with DaVita's, DKC's and DRX's knowledge that Sensipar was not efficacious for the use intended and therefore not cost effective nor medically necessary.

DaVita, DKC and DRX's Medically Unnecessary Use of Renagel

71.    ESRD prevents the kidneys from removing phosphorous from the blood and phosphorous is not removed by dialysis.  Phosphorous is present in many foods and is absorbed through the digestive tract into the blood stream.  Having increased levels of phosphorous causes a the demineralization of calcium from the bones and severely depleting calcium stores in the bones, thus weakening them.  As a result, ESRD patients, whether or not they are on dialysis, are prescribed a low phosphorous diet and some type of phosphate binder to block the intestinal absorption of dietary phosphorous.

72.    Renagel, manufactured by GenTex Corp., is a non-calcium based prescription phosphate binder that was one of the drugs along with Sensipar excluded from the ESRD bundle.  Like Sensipar, it is also quite expensive, costing approximately $700 per month per patient.  In addition to Renagel, there are OTC calcium based phosphate binders such as calcium acetate and calcium carbonate, the active ingredient in the antacid "Tums."  Both are equally effective as Renagel in reducing phosphorous levels in ESRD patients, but unlike Renagel, they are both **inexpensive** and are available OTC without a prescription.  The OTC phosphate binders have the add benefit of having fewer side-effects than Renagel.  However, long term use (i.e., 4-5 years) of OTC phosphate binders at the dosages required can cause unsafe levels of calcium to build up.  Since Renagel cannot cause calcium toxicity, it is an appropriate medication for ESRD patients who no longer can tolerate calcium based phosphate

-30-

binders because of increased calcium levels or otherwise.

73. As a tactic to improperly increase profits, during and between June 2008 and 2017, DaVita and DKC failed to prohibit its medial directors, NPs, dieticians and/or contracted or affiliated physicians from recommending and prescribing medically unnecessary Renagel to most of DaVita and DKC's ESRD patients as their primary phosphate binder. Moreover, Dr. Holzner is informed and believed and upon such information and belief thereupon alleges that DaVita and DKC actively promoted and instructed its medical directors NPs, dieticians and contracted and/or affiliated physicians to prescribe Renagel to DKC's ESRD patients. As their initial phosphate binder despite the lack of medically necessity for Renagel's use. Such ESRD patients' Renagel prescriptions typically continued for the remainder of such patients' lives. Because Renagel was not included in the ESRD PPS bundle prior to 2018, DKC and DRX billed Medicare or other Government funded payors for such Renagel and were reimbursed by CMS at 6% over the manufacturer's average sales price (ASP).[20] This surcharge combined with the wholesale volume discount DRX was able to obtain from being a major purchaser of Renagel created a tremendous financial incentive to prescribe medically unnecessary Renagel instead of using much less expensive OTC phosphate binders.[21] As a result of the foregoing, no efforts were made by said defendants to utilize the less expensive OTC phosphate binders for most patients.

74. Typically, the patients' interdisciplinary team's DKC-employed dieticians made the initial order for the patient's Renagel prescription. This order was for at least a month's-plus supply and was immediately forwarded to DRX to furnish the medication by drop shipping the Renagel directly to the patient's home. It was customary for the treating nephrologists to forgo attending the statutorily required weekly interdisciplinary team meetings

---

[20]Renagel began a two year phase-in into the ESRD bundle coverage starting in 2018.

[21]At an estimated 14% volume discount/wholesale price, DaVita, DKC and DRX received approximately $100 million per year of additional profit (after deduction for the Renagel cost) for each of the last six years from improper Renagel use and prescriptions. Because a year's supply of Renagel costs approximately $8,400 per patient and was so widely over-prescribed by DaVita and DKC's physicians, the cost to the Government and MAOs for this fraud is estimated at $500 million per year for each of the past six years based on approximately 60,000 ESRD patients receiving annual Renagel prescriptions.

-31-

as the nephrologists were not compensated by Medicare nor DKC for attending, (*see,* fn 17, *ante*.)  Instead, the treating physicians typically made unscheduled monthly or more frequent visits to the DKC dialysis facility to sign previously filled prescriptions for Renagel.   Once started on Renagel, DKC's systems were set up to continuously drop ship the medications to the patient's home typically for the remainder of the patient's life (the National Kidney Foundation estimates the average life expectancy of ESRD patients on dialyses is five to ten years.) It was common for the patient to be prescribed a quantity of Renagel in excess of their monthly needs so that after several months there was a stockpile of the medication.

75.     The DaVita/DKC-employed members of the interdisciplinary team recommended the use of Renagel and failed to disclose to the treating nephrologists, who  frequently signed the prescription for Renagel, that at DaVita's joint venture SNP the employed team members advocated the use of OTC phosphate binders instead of Renagel for DaVita's SNP patients because Renagel was not cost effective nor more efficacious than OTC phosphate binders. Had defendants recommended the use of OTC phosphate binders and/or disclosed to the treating nephrologists the true facts (i.e., that Renagel was not medically necessary because equally efficacious and less expensive OTC phosphate binders were utilized were used instead of Renagel for DaVita's SNP patients) the treating nephrologists would have refused to sign the requested Renagel prescriptions.  Because the vast majority of ESRD patients could be as effectively treated with much less expensive OTC phosphate binders, such as TUMS, prescribing Renagel was not medically necessary pursuant to 42 U.S.C. §1320c-5(a)(1) which requires assurances that all items and services "will be provided economically and only when, and to the extent, medically necessary."

76.     The DaVita and DKC interdisciplinary teams' use of Renagel was medically unnecessary and not cost effective and/or efficacious because equally effective, safer and much less expensive OTC phosphate binders, such as Tums, were available.  As previously discussed, 42 U.S.C. § 1320c-5(a)(1)  requires healthcare providers to ensure that services,

"will be provided economically and only when, and to the extent, medically necessary."[22] DaVita, DKC and DRX's scheme to knowingly recommend and/or over-prescribe Renagel to increase their income and profits, above and beyond their PPS revenue, resulted in the submission of false and fraudulent claims to the Government and other Government funded payors, such as MAOs, nationwide because Renagel is not a medically necessary, cost-effective and/or efficacious medication unless and until the patient can no longer tolerate the equally effective and much less expensive OTC calcium based phosphate binder. 42 U.S.C. §§ 1320c-5(a)(1) and (3), 1395y(a)(1)(A); 31 U.S.C. § 3729(a).

77.     DaVita has been a partner in a MA Special Needs Plan (SNP) with SCAN Healthplan located in Long Beach, California since about 2007 and continuing to the present. For the SNP, drugs that are not in the ESRD bundle, such as Renagel and Sensipar, are an additional expense to the SNP, which was partially owned by DaVita.  In contrast to the Sensipar and Renagel frauds previously described above, DaVita and DKC's employed interdisciplinary team members who treated the ESRD beneficiaries assigned to the DaVita-SCAN MA SNP advocated that Sensipar not be prescribed and further advocated the use of OTC calcium based phosphate binders, such as Tums, and only recommended or prescribed Renagel when medically necessary in cases where the patient could no longer tolerate such calcium based medications.  DaVita and DKC's actions of not recommending and prescribing Sensipar and utilizing OTC phosphate binders when DaVita is financially on the hook for the expense, but aggressively recommending and prescribing Sensipar and Renagel whenever it can be billed separately and serve as a source of additional income, is evidence of DaVita and DKC's knowledge and fraudulent intent to recommend and over-prescribe Renagel for profit although it was not cost effective nor medically necessary to do so.

78.     As previously discussed in ¶74 and footnote 21 *ante*, Renagel was a source of additional revenue to DaVita because (a) DKC was able to charge Medicare or other Government funded payors 6% above the ASP as reimbursement for Renagel and (b), DRX

---

[22]Additionally, § 1320c-5(a)(3) requires assurances that items and services, "will be supported by **evidence** of medical necessity and quality.... " (Emphasis added.)

as one of the nations major purchasers of the drug, was able to obtain volume wholesale discounts.    This came to an end beginning in 2018 when 25% of the Renagel's cost was shifted into the ESRD PPS bundle, as part of a two year phase in.    Relator is informed and believes and upon such information and belief alleges that the first year 25% cost shift into the ESRD PPS bundle offset the additional revenue generated by prescribing Renagel and made its continued use an additional expense to DaVita.  As a result, beginning in 2018, DaVita discontinued DRX's operations and instructed DKC to no longer have its interdisciplinary teams request or authorize prescriptions for Renagel.

79.    Renagel's immediate disuse by DaVita, DKC and DRX as soon as it was no longer a source of additional revenue, due to the partial cost shift,  is evidence that its prior use during and between 2008 and 2017 was done to improperly increase revenues and knowledge of the drugs lack of medical necessity throughout.

80.    As a result of Relator's own research and investigations and from discussing the topic with numerous DaVita and DKC nephrologists during and between 2007 and 2017, Relator confirmed that Renagel was routinely prescribed and furnished by DKC and DRX to Davita's and DKC's non-SNP ESRD patients as its first and only phosphate binder and that such practice was carried out at DKC dialysis facilities throughout the nation.  This practice occurred despite DaVita's, DKC's and DRX's knowledge that Renagel was not a cost effective nor medically necessary medication for most ESRD patients.  Had CMS known that Renagel was not medically necessary for DKC's ESRD patients CMS and other Government funded payors would have denied all claims for payment because medical necessity is an expressed condition precedent to all Medicare payments pursuant to 42 C.F.R. § 1395y(a)(1)(A).

<u>FIRST CLAIM FOR RELIEF</u>

(Violation of 31 U.S.C. § 3729(a) against all defendants)

81.    Relator realleges and incorporates by reference all prior paragraphs of this complaint as though fully set forth at length.

82.    At all times mentioned, defendants, and each of them, routinely and repeatedly violated 31 U.S.C. § 3729(a)(1) by:

     i.     Knowingly presenting and/or causing to present to agents, contractors or employees of the Government false and fraudulent claims for payment and approval;

     ii.    Knowingly making, using, and/or causing to make or use false records and statements to get false and excessive claims paid or approved by Medicare;

     iii.   Conspiring among themselves and non-employee nephrologists to violate 31 U.S.C. § 3729(a)(1)(A) and/or (B); and

     iv.   Knowingly making, using or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money to the Government in violation of 31 U.S.C. § 3729(a)(1)(G).

83.    Relator is informed and believes, and upon such information and belief alleges, that as a result of defendants' fraudulent misconduct, the Government was damaged in excess of $1 billion.

84.    As a result of defendants' conduct, defendants are liable to the Government for three times the amount of damages sustained by the Government as a result of the false and fraudult6tent misconduct alleged above.

85.    As a result of defendants' conduct, 31 U.S.C. § 3729(a) provides that defendants are liable to the Government for civil penalties between $5,000 and $10,000 for each such false and fraudulent claim for payment.

86.    Relator is also entitled to recover attorneys fees, costs and expenses from defendants pursuant to 31 U.S.C. § 3730(d).

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff and *Qui Tam* Relator prays for relief as follows:

FOR THE FIRST CLAIM FOR RELIEF

1.    Treble the Government's damages according to proof;

-35-

2.    Civil penalties according to proof;

3.    A Relator's award of up to 30% of the amounts recovered by or on behalf of the Government;

4.    Attorneys fees, expenses, and costs; and

5.    Such other and further relief as the Court deems just and proper.


HANAGAMI LAW
A Professional Corporation

THE ZINBERG LAW FIRM
A Professional Corporation

Dated: April 25, 2019          By: */s/Abram J. Zinberg*
                               Abram J. Zinberg
                               Attorneys for Plaintiff and *Qui Tam* Relator,
                               Charles M. Holzner, M.D.


## REQUEST FOR JURY TRIAL

Plaintiff and *Qui Tam* Relator hereby requests a trial by jury.


HANAGAMI LAW
A Professional Corporation

THE ZINBERG LAW FIRM
A Professional Corporation

Dated: April 25,  2019          By: */s/Abram J. Zinberg*
                                Abram J. Zinberg
                                Attorneys for Plaintiff and *Qui Tam* Relator,
                                Charles M. Holzner, M.D.


-36-